UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | |
|---|---|
| **DERRICK ROBERTS, JERMAINE BELL, JARVIS HILL, KEITHDRICK PATTERSON, TADARIOUS DIXON, DEMETRIUS PATTERSON, LAMONTE YOUNG, and DANTRELL PATTERSON,** | **CASE NO. 2:17-cv-340** |
| *Plaintiffs*, | **JURY TRIAL DEMANDED** |
| v. | |
| **SANITATION SOLUTIONS, INC.,** | |
| *Defendants*. | |

## ORIGINAL COMPLAINT

Plaintiffs Derrick Roberts, Jermaine Bell, Jarvis Hill, Keithdrick Patterson, Tadarious Dixon, Demetrius Patterson, Lamonte Young, and Dantrell Patterson (collectively "Plaintiffs"), by and through their attorneys, bring this action for damages and other legal and equitable relief from the violation of the laws proscribing discrimination based on race, color, and retaliation, stating the following as Plaintiffs' claims against Sanitation Solutions, Inc. ("SS" or "Company" or "Defendant").

## INTRODUCTION

1. This is an action brought by Plaintiffs seeking damages from Defendant for acts of intentional discrimination based on race and color as well as for acts of retaliation, because Plaintiffs engaged in protected activity. Defendant's acts of discrimination and retaliation are in violation of Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended

**ORIGINAL COMPLAINT**

and 42 U.S.C § 2000e et. seq., the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 *et seq*.; and the 1991 Civil Rights Act, as amended, 42 U.S.C. § 1981a *et seq*.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) 42 U.S.C. § 1981 *et seq*., as amended and 42 U.S.C. § 1981a *et seq*., as amended.

3. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

4. Defendant operates a waste removal company headquartered at 1806 S Church St, Paris, TX 75460. Upon information and belief, SS provides waste removal services for fifty (50) communities throughout northeast Texas.

5. Plaintiff Derrick Roberts is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

6. Plaintiff Jermaine Bell is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

7. Plaintiff Jarvis Hill is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

8. Plaintiff Keithdrick Patterson is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

9. Plaintiff Tadarious Dixon is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

10. Plaintiff Demetrius Patterson is a person who has been aggrieved by Defendant's actions. He was at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

11. Plaintiff Lamonte Young is a person who has been aggrieved by Defendant's actions. He was at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

12. Plaintiff Dantrelle Patterson is a person who has been aggrieved by Defendant's actions. He was at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

**EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES**

13. On or about October 27, 2015, Plaintiff Derrick Roberts filed a complaint of discrimination with the EEOC. Plaintiff Roberts has requested that the EEOC issue a Notice of Right to Sue.

14. On or about November 2, 2015, Plaintiff Jermaine Bell filed a complaint of discrimination with the EEOC. Plaintiff Bell has requested that the EEOC issue a Notice of Right to Sue.

15. On or about October 19, 2015, Plaintiff Jarvis Hill Roberts filed a complaint of discrimination with the EEOC. Plaintiff Hill has requested that the EEOC issue a Notice of Right to Sue.

16. On or about September 30, 2015, Plaintiff Keithdrick Patterson filed a complaint of discrimination with the EEOC. Plaintiff Patterson has requested that the EEOC issue a Notice of Right to Sue.

17. On or about October 19, 2015, Plaintiff Tadarious Dixon filed a complaint of discrimination with the EEOC. Plaintiff Roberts has requested that the EEOC issue a Notice of Right to Sue.

18. On or about October 7, 2015, Plaintiff Lamonte Young filed a complaint of discrimination with the EEOC. Plaintiff Young has requested that the EEOC issue a Notice of Right to Sue.

19. On or about November 4, 2015, Plaintiff Dantrelle Patterson filed a complaint of discrimination with the EEOC. Plaintiff Patterson has requested that the EEOC issue a Notice of Right to Sue.

## FACTS UNDERLYING CLAIMS

20. Black employees of SS have been subjected to discrimination and harassment for many years. This discrimination and harassment manifested itself through the direct manner in which SS management and co-workers treated Plaintiffs, and by the systemic atmosphere of bigotry that surrounded them at work. The discrimination and harassment continues to this day.

21. For years Black employees have been subjected to racial slurs at SS, including the prolific use of the word "nigger." Multiple witnesses report hearing White SS employees use the word "nigger" at least once per week and sometimes up to three or four times per day. White employees felt empowered to call Black employees "boy." This was a common means of harassing Black employees.

22. Further, a main door at SS had the words "no nigger" carved into it. When complaints were made, SS would not take timely or effective remedial measures to remove and prevent the racially offensive language and symbols. A bathroom door had a swastika drawn on it; it stayed on the door for over a year, was never painted over or covered up, and stayed up until the bathroom was remodeled.

23. Multiple witnesses reported witnessing nooses displayed at SS locations and on SS trucks. Although members of Company management were informed—including the owner of the Company—nothing was done.

24. These examples are only a few of the obvious and severe indications that SS management allowed its White employees to harass and degrade Black employees on a daily basis. This racial hostility existed throughout the workplace, and were condoned and encouraged by SS management.

25. SS further discriminates against Black employees by creating a disparity in pay. White workers on the same shift performing the same tasks as Black employees are often paid more money than Black employees doing the same work.

26. Black workers are not given equivalent raises as their similarly situated White co-workers. While the employee handbook states that employees will receive a raise after 90 days, Plaintiffs did not receive one. Moreover, White workers with less experience were consistently

hired in favor of and/or received promotions and wage increases over more qualified Black employees. White employees have been given more opportunities than Black employees to drive preferred routes and drive safer, less dangerous trucks. Black employees are routinely given more difficult, dangerous, and dirty jobs compared to their similarly situated White co-workers.

27. The level of discipline is also much higher for Black employees. White employees may receive light discipline in situations for which Black employees were suspended or terminated.

28. The terms and conditions of employment relating to Black employees, and those who associate with or support Black employees, are significantly altered by the discrimination against said employees who are subjected to discrimination in SS's hiring, work assignment, and firing policies.

29. Ignoring the racially hostile environment described above, SS management never required its employees to undergo any sort of discrimination or harassment training.

30. When the Plaintiffs retained counsel and provided SS with a written list of grievances, SS began a concerted pattern of retaliation, and all Plaintiffs who were still employed by the Company were terminated.

## ADDITIONAL ALLEGATIONS OF THE PLAINTIFFS

### Derrick Roberts

31. Mr. Roberts worked as a driver for SS. In 2014, Mr. Roberts was part of a group of Black employees at the Company who raised issues of racial discrimination in the workplace after they witnessed racial graffiti, which stated "no nigger," in the bathroom, heard racial slurs being used by other employees, and felt disparately treated by management.

32.     On or about January 4, 2014, the truck Mr. Roberts was driving broke down. Upon his return to the garage to have the truck fixed, Raymond, a White lead mechanic said after fixing the truck "yeah, I nigger rigged it." Mr. Roberts asked his White supervisor if he heard what Raymond said. It was only after two other employees said they heard it that the White supervisor finally admitted that he had heard the remark.

33.     On or about August 29, 2014, Jeremiah, a White employee, called Mr. Roberts a "nigger." Mr. Roberts reported the comment to his White supervisor who said it was fine because Black culture "uses it all the time."

34.     On or about December 4, 2014, Mr. Roberts was written up by his White supervisor for missing a safety meeting. However, there was no safety meeting. When Mr. Roberts protested, his White supervisor stated it was a briefing. Mr. Roberts again stated that was not true to which his White supervisor responded, "be safe—there's your briefing" and refused to remove the write up.

35.     In March 2015, Mr. Roberts' schedule was significantly reduced when the Company gave his Wednesday route to Justin, a new White employee.  The Company also took away Roberts' helpers, forcing him to do his route alone. Mr. Roberts was repeatedly belittled and subjected to disparate treatment in the workplace in an effort to force him from his position.

36.     Like many of the employees who complained about racial discrimination, Mr. Roberts was consistently placed on trucks which broke down and were dangerous. Mr. Roberts has been stranded on his route, has had his truck break down, and has seen the fuel line on a truck leaking while he was driving.  On or about July 23, 2015, his truck caught fire in the middle of his route which caused him to dive out while the truck was still moving.

37. Mr. Roberts was required by SS to service a rural address, in pre-dawn hours, where a large Confederate flag was flown. When Mr. Roberts complained to SS management that he feared for his safety as an African-American man having to come onto that person's property in the dark, he was told that it was "free speech" and there was nothing they could do about changing his route.

38. Mr. Roberts was constructively discharged in or about November 2015.

### Jermaine Bell

39. In June 2014, Mr. Bell was hired by the Company as a waste management residential helper earning $8 per hour. In 2014, Mr. Bell was one of a group of Black employees at the Company who raised issues of racial discrimination in the workplace after racial graffiti, which stated "no nigger," was found in the bathroom, in addition to the use of racial slurs by other employees. Despite complaints to the management, no corrective action was taken. Upon information and belief, this behavior continues to this day.

40. Mr. Bell witnessed another Black helper have his employment terminated as a result of being the last helper hired, despite the fact that the last helper hired was actually a White employee.

41. As a residential helper, Mr. Bell worked with a variety of waste management drivers to collect waste on a variety of routes. He witnessed White drivers provided with better trucks and equipment than their Black counterparts. The trucks Mr. Bell worked on often broke down, were not properly equipped, and could be dangerous to work on; however, despite complaints about the safety of the trucks, Mr. Bell was continually placed on dangerous equipment.

42. When Mr. Bell complained about racial harassment in the workplace, he was subjected to a decrease in his hours and pay. In particular, on or about August 3, 2015, Mr. Bell was taken off of his regular route and replaced by JD, a White employee.

43. Mr. Bell was terminated in or about June of 2016.

### Jarvis Hill

44. Mr. Hill was hired as a residential helper by SS in June 2014 making $8 per hour. In 2014, Mr. Hill was part of a group of Black employees at the Company who raised issues of racial discrimination in the workplace after they witnessed racial graffiti, which stated "no nigger," in the bathroom, heard racial slurs being used by other employees, and were disparately treated by management. In particular, throughout his employment, Mr. Hill was subjected to racial slurs, including "boy," "you people," and "nigger." Upon information and belief, this behavior continued to this day.

45. Mr. Hill complained directly to his White supervisor about the frequent use of the word "nigger." Instead of taking corrective action, the White supervisor said to Mr. Hill, "Y'all people use it in music so why is it not okay for White people to use it?"

46. In an October 2014 meeting, Mr. Hill made a complaint and a White driver responded, "All you people do is complain" referring to Black people. Mr. Hill again complained to his White supervisor who took no corrective action.

47. On or about February 6, 2015, Mr. Hill arrived for work and his White supervisor refused to allow him to work without providing a reason. Yet, at the same time, there were White new hires working five (5) days per week. Mr. Hill was then repeatedly kept off the schedule, but forced to report to work so he did not receive a "no call no show."

**ORIGINAL COMPLAINT**

48. On or about February 27, 2015, Mr. Hill was suspended without pay for allegedly taking a lunch break longer than 60 minutes. However, Mr. Hill is a helper and had no control over when and for how long a truck stays out. Despite the fact that there were nine (9) employees involved in this incident, upon information and belief Mr. Hill and two other Black employees were the only employees suspended.

49. In March 2015, Mr. Hill's father became very ill and Mr. Hill was given permission to take time off from the White payroll supervisor. However, his White supervisor then falsely accused Mr. Hill of not showing up for work despite the fact that Mr. Hill was given permission for his absence. Mr. Hill repeatedly contacted his White supervisor to get placed back on the schedule, but was refused. Despite this, upon information and belief, the Company has continued to hire new employees.

50. In July and August 2015, Mr. Hill again reapplied to the Company for the same position in which he previously worked; however, the Company again failed to re-hire him in retaliation for his complaint about racial discrimination in the workplace.

## Keithdrick Patterson

51. Mr. Patterson was hired by the Defendant as a residential helper earning $8 per hour. In 2014, Mr. Patterson was part of a group of Black employees at the Company who raised issues of racial discrimination in the workplace after they witnessed racial graffiti, which stated "no nigger," in the bathroom, heard racial slurs being used by other employees, and felt disparately treated by management. For example, Mr. Patterson was repeatedly called a "nigger" by a White driver he was assigned to. No corrective action was ever taken despite complaints to management. Upon information and belief, this behavior continues to this day.

52. After bringing these issues to management, Mr. Patterson suffered from retaliation by management. On or about July 2, 2015, Mr. Patterson called his White supervisor eight (8) hours in advance of a shift to inform him he could not come to work; in response he was told "Don't even worry about coming back." When Mr. Patterson stated he felt he was being retaliated against, his White supervisor sent him a text message stating "Bring a [medical] excuse."

53. Upon information and belief, employees who have not complained about discrimination are able to take time off without harassment. Upon information and belief, a White employee called out of work five (5) times in a six-month period and was not required to bring an excuse.

54. In or around March 2015, Mr. Patterson's hours were reduced and given to a White employee. Mr. Patterson complained to his White supervisors about the reduction in hours, but his hours continued to be reduced.

55. In July 2015, Mr. Patterson was injured at work and received Workers' Compensation. From that point forward, management consistently refused to provide him with the same routes he previously worked. As a result, his pay was significantly decreased and Mr. Patterson had no choice but to look for other employment.

**Tadarious Dixon**

56. Mr. Dixon was employed by the Company as a residential helper beginning in June 2014 making $8 per hour. In 2014, Mr. Patterson was part of a group of Black employees at the Company who raised issues of racial discrimination in the workplace after racial graffiti, which stated "no nigger," was found in the bathroom, in addition to racial slurs used by other employees. No corrective action was ever taken despite complaints to management. Upon information and belief, this behavior continues to this day.

57.     After bringing these issues to management, Mr. Patterson suffered from retaliation by management. While the employee handbook states that employees will receive a raise after 90 days, Mr. Dixon did not receive one.

58.     On or about December 27, 2014, Mr. Dixon was riding in a truck with two White employees. A White male employee said to Mr. Dixon "I want my money, nigger." Mr. Dixon reported the incident to his White supervisor, but no corrective actions were taken, and Mr. Dixon was forced to ride with the same White employees the next day.

59.     Mr. Dixon consistently went to school following his shifts and never missed work for school. On or about February 4, 2015, Mr. Dixon began to see his hours decreased. Mr. Dixon was demoted down to an "extra employee" -- someone who was only called in for work when another employee called out. Upon and information and belief, newer White hires continued to receive preferential routes and hours.

60.     Mr. Dixon and other employees who complained about racial discrimination were frequently forced to use dangerous equipment to run their routes. There were numerous accidents as a result of the faulty equipment. On or about August 11, 2015, Mr. Dixon was driving his truck with a Hispanic employee. The truck broke down and, in a retaliatory action, Mr. Dixon was left waiting two hours in 94 degree heat, without water, for the Company to pick him up.

61.     Mr. Dixon was terminated in or about June of 2016.

### Demetrius Patterson

62.     Mr. Patterson worked as a driver for Sanitation Solutions making $10.75 an hour. In 2014, Mr. Patterson was part of a group of Black employees at the Company who raised issues of racial discrimination after witnessing racial graffiti, which stated "no niggers," in the bathroom, hearing racial slurs being used by other employees, and being disparately treated by management.

**ORIGINAL COMPLAINT**

Upon information and belief, this behavior continues to this day.

63. In January 2014, Mr. Patterson was in the garage when another truck was being fixed. He heard a White lead mechanic say "yeah, I nigger rigged it" regarding the work he performed on the truck. A White supervisor was present, but took no corrective action.

64. Mr. Patterson also witnessed an incident in which a White employee called Plaintiff Derrick Roberts a "nigger." Once again, no corrective action was taken despite it being reported to management.

65. Additionally, Mr. Patterson witnessed a White supervisor state "If I owned this Company, there would be no Black workers."

66. Mr. Patterson and his fellow Plaintiffs were also subjected to pay disparity. Mr. Patterson, who was earning $11.25 per hour upon his constructive discharge, discovered that his White helper was earning $10.50 per hour and, at that time, did not even have a CDL license. He was also made aware that two other White drivers with less seniority were earning more than him.

67. When Mr. Patterson approached management about the disparity, his White supervisor said that he would look into it, but when Mr. Patterson followed up about receiving a raise, the White supervisor refused to take his phone calls. Mr. Patterson was repeatedly subjected to disparate treatment as a result of participating in the protected activity of complaining about racial discrimination in the workplace.

68. After bringing these issues to management, Mr. Patterson was constructively discharged as a result of the harassment and retaliation he suffered.

### Lamonte Young

69. Mr. Young was employed with Sanitation Solutions as a driver beginning in July 2014 making $11.00 per hour. In 2014, Mr. Young was part of a group of Black employees at the

Company who raised issues of racial discrimination after witnessing racial graffiti, which stated "no nigger," in the bathroom, hearing racial slurs being used by other employees, and being disparately treated by management. No corrective action was ever taken despite complaints to management. Upon information and belief, this behavior continues to this day.

70. After bringing these issues to management, Mr. Young suffered from retaliatory efforts designed to force him to resign. On or about December 22, 2014 Mr. Young was falsely accused of taking a long lunch. He was then suspended without pay and threatened with being fired.

71. In what became a pattern, the Company repeatedly suspended Mr. Young after unsubstantiated accusations and without following the proper procedure of giving a verbal warning and a written warning prior to suspension.

72. In mid-January 2015, Mr. Young's routes were changed again and he was forced to work more and earn much less. In late-January 2015, Mr. Young had his newer truck taken from him and given to two White employees. Mr. Young was then given an older truck with failing brakes. As a result, Mr. Young was thrown into a ditch and suffered a two-hour delay on his route.

73. On or about July 1, 2015, Mr. Young was again suspended without pay for three days for not cleaning behind the blades of the truck. However, as management was aware, Mr. Young was forced to drive a truck without air conditioning and it was dangerously hot for him to clean the blades under those conditions. Two other White employees were not suspended for the same action.

74. Mr. Young has repeatedly reported the dangerous condition of the trucks; however, the Company routinely sent him out on a dangerous truck. On or about August 11, 2015, he

reported that the lights were out on his truck, but they required him to use it anyway. On or about September 21, 2015, Mr. Young reported these issues to OSHA.

75. On or about September 9, 2015, Mr. Young overheard a White supervisor discussing a phone call he received from Jarvis Hill, a former Black employee who had also complained about racial discrimination. The White supervisor stated that Mr. Hill was a "traitor" and that he would "never get his job back." Upon information and belief, all of the employees who previously complained about racial discrimination were being treated with equal retaliation in an effort to force them to resign.

76. Mr. Young was terminated in December 2015.

### Dantrell Patterson

77. Mr. Patterson worked as a helper for Sanitation Solutions making $8 an hour. In 2014, Mr. Patterson was part of a group of Black employees at the Company who raised issues of racial discrimination after witnessing racial graffiti, which stated "no niggers," in the bathroom, hearing racial slurs being used by other employees, and being disparately treated by management. Upon information and belief, this behavior continues to this day.

78. On or about January 4, 2014, Mr. Patterson witnessed the lead White mechanic state that he "nigger rigged" a truck while discussing a quick fix he made. Despite a White supervisor being present, no corrective action was taken. Mr. Patterson heard White employees say the word "nigger" at least six or seven times, and is aware of no corrective action being taken despite complaints to management.

79. After he brought these issues to management, Mr. Patterson was subjected to further discrimination and retaliation. In particular, Mr. Patterson witnessed Black employees who asserted a protected right being given dangerous and poorly maintained trucks to drive. The truck

he often rode in smoked and leaked oil. While repair logs are submitted on a daily basis, the trucks are not fixed. Upon information and belief, employees who did not complain about racial discrimination were provided with newer and safer trucks, longer routes, and more hours.

80. When Mr. Patterson complained, he was told by a White supervisor that Mr. Patterson "didn't matter." When Mr. Patterson pulled out his cell phone to record this statement, the White supervisor said "I see that [co-Plaintiff] Derrick Roberts has rubbed off on you. You say another word you're going to be gone."

81. Mr. Patterson was also subjected to pay disparity. Mr. Patterson, who earned $8 per hour, was made aware that White hires in the same position were earning $9 per hour. When Mr. Patterson approached his White supervisor about this disparity, he was told that it was "none of [your] business."

82. Mr. Patterson was terminated in or about June of 2016.

## CAUSES OF ACTION

### Title VII and 42 U.S.C. § 2000e *et. seq.* of the Civil Rights Act of 1964, as amended and 42 U.S.C § 2000e *et. seq.*

83. Each Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

84. The conduct alleged herein violates Title VII as Defendant has engaged in the practice of discrimination and harassment on account of race and color. Defendant also engaged in unlawful retaliation against each of the Plaintiffs in violation of Title VII.

85. Each Plaintiff's requests for relief are set forth below.

## 42 U.S.C. § 1981

86. Each Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

87. The conduct alleged herein violates Section 1981 of the United States Code as Defendant has engaged in the practice of discrimination and harassment on account of race and color. Defendant also engaged in unlawful retaliation against each of the Plaintiffs in violation of Section 1981.

88. Each of the Plaintiffs requests for relief is set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendant as follows:

a. Preliminary and permanent injunctions against the Defendant and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

b. A judgment declaring that the practices complained of herein are unlawful and in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 et seq.; the 1991 Civil Rights Act, as amended, 42 U.S.C. § 1981a et seq.; Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq.

c. Granting an order restraining Defendant from any retaliation in any form against Plaintiffs for participation in this litigation;

d. All damages which Plaintiffs have sustained as a result of Defendant's conduct, including back pay, front pay, general and special damages for lost compensation, and job benefits they would have received but for Defendant's discriminatory practices, and for emotional distress, humiliation, embarrassment, and anguish;

e. Front pay to the Plaintiffs until such time as they can be placed into the same position, title and grade they would now occupy but for Defendant's discriminatory practices;

f. Exemplary and punitive damages in an amount commensurate with Defendant's ability and so as to deter future malicious, reckless and/or intentional conduct;

g. Awarding Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

h. Pre-judgment and post-judgment interest, as provided by law;

i. Requiring the Company to reinstate the employment of Plaintiffs; and

j. Granting Plaintiffs other and further relief as this Court finds necessary and proper.

Dated: April 20, 2017

Respectfully submitted,

/s/ Eric M. Albritton

Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Shawn A. Latchford
Texas State Bar No. 24066603
sal@emafirm.com
**ALBRITTON LAW FIRM**
111 West Tyler Street
Longview, Texas 75601
Telephone: (903) 757-8449
Facsimile: (903) 758-7397

Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@dpelaw.com
**DiNovo Price Ellwanger LLP**
7000 North MoPac Expressway, Suite 350
Austin, Texas  78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627

*Of Counsel:*

James A. Vagnini
N.Y. State Bar No. 2958130
jvagnini@vkvlawyers.com
Sara Wyn Kane
N.Y. State Bar No. 2935617
skane@vkvlawyers.com

**ORIGINAL COMPLAINT**

        Robert J. Valli, Jr.
        N.Y. State Bar No. 2383107
        rvalli@vkvlawyers.com
        **Valli Kane &Vagnini, LLP**
        600 Old Country Road, Suite 519
        Garden City, New York 11530
        Telephone: (516) 203-7180
        Facsimile: (516) 706-0248

        **ATTORNEYS FOR PLAINTIFFS**